**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

In Re Application of ALB-GOLD Teigwaren                    <u>**MEMORANDUM AND ORDER**</u>
GmbH for an Order Pursuant to 28 U.S.C. § 1782
to Conduct Discovery for Use in a Foreign                  19-mc-1166 (MKB) (ST)
Proceeding.


---------------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

ALB-GOLD Teigwaren GmbH ("ALB-GOLD") has submitted an application pursuant to

28 U.S.C. § 1782, requesting that the Court issue subpoenas duces tecum allowing it to take

discovery from multiple respondents for use in a foreign proceeding. For the reasons discussed

herein, ALB-GOLD's request is GRANTED in part and DEFERRED in part to allow for a brief

period of jurisdictional discovery.

**BACKGROUND**

ALB-GOLD is a German pasta manufacturer. ALB-GOLD seeks discovery from five

Respondents: (i) Interpage Co., Inc. ("Interpage"), a grocery import-export company based in

Brooklyn, NY;[1] (ii) Grigori Vernikov, the owner of Interpage;[2] (iii) Alex's Meat Distributors Corp.

("Alex's Meat"), a grocery distributor based in Brooklyn, NY; (iv) Vladimir Oterin, the owner of

Alex's Meat; and (v) Inna Vernikov, Mr. Vernikov's daughter and the apparent drafter of a

settlement agreement between Interpage and Alex's Meat.

This application arises from the arbitration of a contract dispute between ALB-GOLD and

Interpage. The two companies entered into a five-year Exclusive Importation and Sales Agreement

---

[1] As discussed below, Mr. Vernikov has established several companies bearing the name "Interpage." For ease of reference, unless otherwise stated, "Interpage" refers to the company Interpage Co., Inc., formerly incorporated in New York.

[2] Mr. Vernikov's first name is spelled inconsistently throughout the record. Without endorsing the spelling as correct, the Court spells his name "Grigori."

(the "Distribution Agreement") on January 2, 2013. *See* Declaration of Karl Geercken, Esq. ("Geercken Decl."), Exh. 2 (the "Arbitration Award") ¶¶ 30–37, ECF No. 3-2 at 1–93. The Distribution Agreement provided that ALB-GOLD's pasta would be sold in the United States exclusively under Interpage's private label "Delicious Wonders." *Id.* ¶ 31. The Distribution Agreement set annual targets for the sale of ALB-GOLD's pasta by Interpage. In the first year, the target was 144 net tons of pasta. *Id.* ¶ 35. In each subsequent year, the annual targets would increase. *Id.* Over the course of the five-year period covered by the Distribution Agreement, Interpage's targeted sales totaled 960 net tons of pasta. *Id.*

As the end of the first year of the agreement approached, it became clear that Interpage had failed to meet the minimum sales target. *Id.* ¶¶ 175–76. Consequently, at an unspecified date in the first half of December 2013, a representative for ALB-GOLD informed Mr. Vernikov by telephone that ALB-GOLD would stop supplying Interpage with pasta for the United States market.[3] *Id.* ¶ 44.

Shortly after this phone call, on December 16, 2013, Interpage claims that it entered into a separate agreement to supply Alex's Meat, a grocery distributor, with Delicious Wonders pasta.[4] *See* Geercken Decl., Exh. 3 (the "Alex's Meat Agreement"), ECF No. 3-2 at 94–104; *see also* Arbitration Award ¶¶ 46–47. Pursuant to this agreement, Interpage would supply Alex's Meat with 960 net tons of Delicious Wonders pasta over a five year period, for which Alex's Meat would pay a total of $2,896,000. Arbitration Award ¶ 47. As such, by virtue of entering into the Alex's Meat

---

[3] ALB-GOLD continued to supply Interpage with pasta for sale in Israel. Arbitration Award ¶ 179.
[4] ALB-GOLD questions the authenticity of the Alex's Meat Agreement, including whether Interpage and Alex's Meat entered into the agreement on this date and whether both parties actually intended to be bound by the agreement.

Agreement, Interpage seemingly could have satisfied the entirety (or almost the entirety) of its sales targets in the Distribution Agreement with ALB-GOLD in one fell swoop.

On December 17, 2013, the day after the Alex's Meat Agreement was executed, Mr. Vernikov learned from the freight forwarder responsible for receiving shipments from ALB-GOLD that an order of pasta placed by Interpage on November 7, 2013 had not arrived. *Id.* ¶ 48. ALB-GOLD indeed did not fulfill this order, and it did not regularly provide Interpage with pasta for sale in the U.S. market after this point in time. Interpage, however, despite having had an agreement to buy 960 tons of pasta from ALB-GOLD and an agreement to sell 960 tons of pasta to Alex's Meat, did not notify ALB-GOLD of the existence of the Alex's Meat Agreement for almost four years, until it filed a notice of claim to initiate arbitration against ALB-GOLD on October 18, 2017. *Id.* ¶¶ 57, 193–94.

Instead, between January 2014 and May 2015, Interpage supplied Alex's Meat with pasta that was made by another manufacturer but sold under the Delicious Wonders label. *Id.* ¶¶ 201, 270. At the arbitration hearing, Mr. Vernikov and Mr. Oterin testified that this pasta was of inferior quality and an inadequate substitute, *id.* ¶ 270, but Alex's Meat nonetheless accepted it over the course of this period. From May 21, 2015 to March 3, 2017, however, Interpage's use of the Delicious Wonders label was enjoined pursuant to an order issued as part of a trademark action in this District, leading the company to cease selling the pasta. *Id.* ¶¶ 51–52, 54; *see also Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 546 (E.D.N.Y. 2017).

On November 13, 2016, Interpage and Alex's Meat entered into a Settlement Agreement (the "Alex's Meat Settlement Agreement"), which was ostensibly intended to resolve Interpage's nonperformance of the Alex's Meat Agreement. Arbitration Award ¶ 53. According to the testimony of Mr. Vernikov at the arbitration hearing, this settlement was drafted by his daughter,

Ms. Inna Vernikov, Esq. *Id.* ¶ 243. Pursuant to the settlement, Interpage agreed to pay Alex's Meat $2,209,600 in damages for failure to supply pasta. *Id.* ¶ 53. This figure, however, did not credit Interpage for any of the substitute Delicious Wonders pasta that it provided to Alex's Meat between January 2014 and May 2015. *Id.* ¶ 282; ALB-GOLD's Memorandum in Support of § 1782 Application ("Memo ISO") 11–12, ECF No. 2.

Additionally, the Alex's Meat Agreement contained clauses that, ALB-GOLD argues, provided Interpage with "powerful defenses" to its enforcement. *See* Arbitration Award ¶¶ 228, 254–58. Those defenses included a clause that reads, "The Seller has the right to unilaterally withdraw this contract, notifying the Buyer not less than 20 days before the schedule [sic] termination date," *id.* ¶ 254, and a force majeure clause allowing cancellation of the agreement in the events of actions that the parties "could not neither expect nor prevent [sic]," *id.* ¶ 257. Interpage apparently did not assert those defenses prior to entering into the Alex's Meat Settlement Agreement.

### ii. Interpage and ALB-GOLD arbitrate their disputes

On October 18, 2017, Interpage submitted a request for arbitration against ALB-GOLD. *Id.* ¶ 57. Interpage alleged (among other disputes not relevant here) that ALB-GOLD breached the Distribution Agreement by ceasing to ship pasta beginning with the November 7, 2013 order. *Id.* The majority of the damages claimed by Interpage stemmed from its inability to fulfill its obligations under the Alex's Meat Agreement, which Interpage claimed foreseeably and reasonably resulted in the damages it agreed to pay under the Alex's Meat Settlement Agreement. *Id.* ¶¶ 200–02, 227.

At the arbitration, ALB-GOLD offered several arguments in response. It submitted that the 2013 Alex's Meat Agreement "defies credibility" because it is commercially implausible that a

distributor of Alex's Meat's size would order 960 tons of egg pasta over a 5 year period, and because Interpage never informed ALB-GOLD of this deal even though it would have almost single-handedly satisfied Interpage's delivery targets (indeed, mirrored the exact volume of the combined annual targets) under the Distribution Agreement. *Id.* ¶ 228. ALB-GOLD also argued that the 2016 Alex's Meat Settlement Agreement was fraudulent and the product of collusion between Interpage and Alex's Meat. *Id.*

The Arbitral Tribunal (hereinafter the "Tribunal") did not find that either the Alex's Meat Agreement or the Alex's Meat Settlement Agreement was the product of fraud or collusion. The Tribunal noted that it "examined with great attention" ALB-GOLD's allegations to this effect. *Id.* ¶ 241. However, it found that ALB-GOLD had not discharged its burden to prove that either agreement was fraudulent.[5] *Id.* On November 27, 2018, the Tribunal ordered ALB-GOLD to pay Interpage $1,414,927 in consequential damages arising from the Alex's Meat Settlement Agreement. *Id.* ¶ 380.

*iii. The instant application under 28 U.S.C. § 1782*

ALB-GOLD filed the instant application to take discovery pursuant to 28 U.S.C. § 1782 on May 1, 2019. *See* Application, ECF No. 1. ALB-GOLD requests that the Court issue subpoenas duces tecum against the five aforementioned entities, requiring them to submit to depositions at ALB-GOLD's counsel's Manhattan offices. *See* Geercken Decl., Exhs. 6–10 ("Proposed Subpoenas"), ECF No. 3-2 at 113–65. ALB-GOLD avers that it intends to use evidence discovered through these subpoenas in an application to the Swiss Federal Supreme Court for "revision" of the arbitral award. Memo ISO 1, 15.

---

[5] A majority of the Tribunal also found, over a vigorous dissent, that Interpage did not fail to mitigate the damages that it agreed to pay pursuant to the Alex's Meat Settlement Agreement. *Id.* ¶¶ 269–72.

The Honorable Margo K. Brodie referred ALB-GOLD's application to the undersigned for disposition. Order dated May 2, 2019. On May 7, 2019, an attorney appearing on behalf of Interpage requested leave from the Court to file a response in opposition to ALB-GOLD's petition, which the Court granted. *See* Letter from Interpage, ECF No. 5; Order dated May 7, 2019. Interpage filed its response on May 17, 2019.[6] Memorandum in Opposition to § 1782 Petition ("Opp'n"), ECF No. 12.

## DISCUSSION

1. <u>Legal Standard</u>

An application for discovery made pursuant to 28 U.S.C. § 1782 requires the district court to undertake two inquiries: "first, whether the district court is authorized to grant the request; and second, if so, whether the district court should exercise its discretion to do so." *In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. M19-CV-88 (BSJ), 2006 WL 3844464, at *4

---

[6] On May 24, 2019, without receiving leave from the Court, ALB-GOLD filed a reply memorandum and exhibits. ECF Nos. 13–15. Interpage filed a letter requesting that the Court disregard and strike ALB-GOLD's Reply, pointing out that the Court's Order dated May 7, 2019 did not allow ALB-GOLD to file a reply and that ALB-GOLD did not otherwise request leave to file one. Interpage's Letter Motion to Strike, ECF No. 16. ALB-GOLD filed a letter in response to Interpage's Letter Motion to Strike asserting that ALB-GOLD was permitted to file a reply without specific leave from the Court pursuant to Local Civil Rule 6.1. *See* ECF No. 17; Local Civil Rule 6.1(b)(3) ("[A]ny reply affidavits and memoranda of law shall be served within seven days after service of the answering papers.").

The Court agrees with Interpage. ALB-GOLD's reliance on Local Civil Rule 6.1 is inapt. The Rule provides a default deadline of seven days to file a reply, but it also provides that the default deadlines may be supplanted if the Court provides an alternative "direction in a particular case." Local Civil Rule 6.1. Here, the Court only granted Interpage leave to file an opposition based on its specific request; that order did not grant ALB-GOLD leave to file a reply. Moreover, the Court only allowed Interpage ten days to file its opposition, whereas the default deadline contained in Local Civil Rule 6.1 provides the nonmovant fourteen days to file an opposition after it is served with moving papers. *See* Local Civil Rule 6.1(b)(2). Although Interpage was not actually "served with" ALB-GOLD's ex parte application whereas ALB-GOLD was served with Interpage's opposition, the fact that the Court provided Interpage only ten days to submit its opposition should have provided sufficient indication that the Court was setting a briefing schedule that diverged from the standard deadlines set forth in Local Civil Rule 6.1. Under these circumstances, ALB-GOLD should have requested explicit permission to file a reply. Because it did not, the Court will disregard ALB-GOLD's reply memoranda and exhibits in deciding the instant Memorandum and Order.

(S.D.N.Y. Dec. 29, 2006) (quoting *In re Application of Grupo Qumma, S.A.*, No. M8-CV-85 (DC), 2005 WL 937486, at *1 (S.D.N.Y. Apr. 22, 2005)); *see also Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83–84 (2d Cir. 2004).

A district court has the authority to grant a § 1782 request for discovery when: 1) the party subject to the request resides in or is found in the district of the district court; 2) the party seeking discovery intends to use it in a proceeding in a foreign tribunal; and 3) the application is made by a foreign or international tribunal or any interested person. 28 U.S.C. § 1782(a); *see In re Application of Gianoli Aldunate*, 3 F.3d 54, 58 (2d Cir. 1993). The petitioner bears the burden of proving that each of these requirements is satisfied. *See In re Godfrey*, 526 F. Supp. 2d 417, 419 (S.D.N.Y. 2007) (citing *In re Kolomoisky*, M19-116, 2006 WL 2404332, at *3 (S.D.N.Y. 2006)).

If the discovery request satisfies the threshold for district court authorization, the court "must then exercise its discretion as to whether and what extent to lend its assistance." *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, 2006 WL 3844464, at *4; *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). In exercising its discretion, the district court should consider the following four factors deemed relevant by the Supreme Court:

> 1)    Whether "the person from whom discovery is sought is a participant in the foreign proceeding."
> 2)    "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to [U.S.] federal-court judicial assistance."
> 3)    "Whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States"; and
> 4)    Whether the § 1782(a) request is "unduly intrusive or burdensome," in which case requests may be rejected or narrowed.

*See Intel*, 542 U.S. at 264–65.

However, the discretion of the district court "is not boundless." *Schmitz*, 376 F.3d at 84. Rather, the court "must exercise [its] discretion . . . in light of the twin aims of the statute:

'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" *Id.* (quoting *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997)).

2. Analysis

The Court will discuss, in turn, ALB-GOLD's application for discovery as to (i) Mr. Vernikov and Interpage, and (ii) Alex's Meat, Mr. Oterin, and Ms. Vernikov.

A. *Mr. Vernikov and Interpage*

At the threshold, 28 U.S.C. § 1782 requires ALB-GOLD to show that Mr. Vernikov and Interpage reside or are found in the Eastern District of New York. ALB-GOLD claims in its application that Mr. Vernikov resides in Brooklyn, New York, *see* Geercken Decl. ¶ 8, ECF No. 3, and that Interpage operates from Brooklyn, New York, *id.* ¶ 12.

The record makes clear (and Interpage does not dispute) that Mr. Vernikov previously resided in Brooklyn, and that Interpage previously operated from Brooklyn. However, with its opposition to ALB-GOLD's application, Interpage has submitted a declaration executed by Mr. Vernikov on May 13, 2019, stating, essentially, that Mr. Vernikov has moved to Florida. *See* Declaration of Grigori Vernikov ("Vernikov Decl."), ECF No. 9. Interpage asserts that this declaration definitively demonstrates (1) that Mr. Vernikov and Interpage are not subject to this Court's jurisdiction, (2) that neither Mr. Vernikov nor Interpage "resides or is found" in this District, and (3) that a subpoena against either would be quashable because of the 100-mile geographical limit contained in Federal Rule of Civil Procedure 45(c)(1)(A). Opp'n 5–8.

The Court agrees that, in light of Interpage's opposition, ALB-GOLD has not met its burden of demonstrating these threshold requirements. However, neither has Interpage

conclusively shown that this Court could not grant ALB-GOLD's application and issue subpoenas against these respondents. As such, the Court, sua sponte, will allow ALB-GOLD to take limited jurisdictional discovery against Mr. Vernikov and Interpage.

First, for his part, Mr. Vernikov declares that he "reside[s] and [is] domiciled in the State of Florida." Vernikov Decl. ¶ 3. While this substantially calls into question ALB-GOLD's claim that Mr. Vernikov resides in Brooklyn, it does not decisively refute it. An individual may be domiciled and reside in one state, but nonetheless also reside in another state. *See Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (citing *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir. 2004)); *see also In re Escallon*, 323 F. Supp. 3d 552, 557 (S.D.N.Y. 2018) (finding that the term "resides" in 28 U.S.C. § 1782 has the same meaning as generally understood at common law). Furthermore, even if Mr. Vernikov does not "reside" in New York, this would not preclude a finding that he is "found" in this District. *See In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002) (holding that petitioner's service of a subpoena in the Southern District of New York on a respondent domiciled in France demonstrated that the respondent was "found" in the Southern District for purposes of § 1782).

But even when the jurisdictional and statutory requirements for a § 1782 application are met, the Second Circuit has noted the importance of the procedural protections governing the issuance of subpoenas contained in Federal Rule of Civil Procedure 45. *See In re Edelman*, 295 F.3d at 178. In particular, a person cannot be compelled by subpoena to attend a deposition that is more than 100 miles away from "where the person resides, is employed, or regularly transacts business in person[.]"[7] Fed. R. Civ. P. 45(c)(1)(A). Here, Interpage's submissions do not

---

[7] The alternative geographical limitation in Rule 45(c)(1)(B)—providing that a person may be commanded to attend a proceeding in a state where the person resides, is employed, or regularly transacts business in person even if the location of the proceeding is more than 100 miles away—is not relevant to

conclusively establish that Mr. Vernikov would be able to quash a subpoena ordering him to appear for a deposition in Manhattan. Not only has Mr. Vernikov failed to aver that he does not "reside" within 100 miles of Manhattan, but has also not claimed that he does not "regularly transact[] business in person" in this area. It is thus unclear whether Mr. Vernikov "resides or is found" in this District and whether a subpoena ordering him to submit to deposition in Manhattan would be enforceable.[8]

Whether the Court could issue a subpoena against Mr. Vernikov's company, Interpage, is similarly unclear on the current record. First, as the Tribunal discussed, Mr. Vernikov has founded several companies called "Interpage." The first was Interpage International Inc., founded by Mr. Vernikov and at least three other persons in New Jersey in 1993; this company was dissolved in 1999. Arbitration Award ¶ 16. Mr. Vernikov incorporated another company called Interpage Co. in New Jersey in 2000. *Id.* ¶ 17. Mr. Vernikov incorporated yet another company known as Interpage Co. in New York in 2003. *Id.* ¶ 19. In 2009 this company apparently dissolved and was

---

an application made pursuant to 28 U.S.C. § 1782. This is because an application for discovery under 28 U.S.C. § 1782 is not brought against a party and does not involve a trial, and one of those two conditions must be met for the alternative geographical limitation to apply. *See* Fed. R. Civ. P. 45(c)(1)(B)(i) (a person may be commanded to attend the proceeding if he "is a party or a party's officer"), 45(c)(1)(B)(ii) (a person may be "commanded to attend a trial" if he "would not incur substantial expense").

[8] Despite these ambiguities, the Court finds that it has personal jurisdiction over Mr. Vernikov. Although the Court may now lack *general* personal jurisdiction over Mr. Vernikov because of his apparent move to Florida, he is still subject to the Court's *specific* personal jurisdiction given that he engaged in all of the transactions and occurrences that are the subject of ALB-GOLD's application while in this District. *See Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 322–23 (S.D.N.Y. 2018) (finding that the district court could exercise specific personal jurisdiction pursuant to New York's long arm statute over subpoenaed non-party because the non-party engaged in substantial business activity in New York and this activity was the subject of the requested subpoena), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018).

More broadly, it is unclear whether 28 U.S.C. § 1782's statutory requirement that a respondent "resides or is found" in a given district merely stands for the requirement that the Court have personal jurisdiction over the respondent. *See In re Sargeant*, 278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017). A forthcoming decision from the Second Circuit may provide further guidance on this issue. *See In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 452 (S.D.N.Y. 2018), *appeal docketed*, No. 18-3226 (2d Cir. Oct. 26, 2018). However, depending on the results of ALB-GOLD's jurisdictional discovery, the Court may not need to decide this question. It will thus not do so at this time.

reincorporated. *Id.* ¶ 23. It then ultimately dissolved again on October 5, 2017. *See* New York State Department of State Corporation and Business Entity Database ("N.Y. Corporations Database"), DOS ID # 3776108.[9] And in 2011, Mr. Vernikov incorporated an additional entity known as Interpage International Inc. in New York, which remains active as of the date of this Order. Arbitration Award ¶ 25; N.Y. Corporations Database, DOS ID # 4078842.

Mr. Vernikov's declaration and Interpage's briefing obfuscate the issue of corporate identity by seemingly referring to every entity Mr. Vernikov has operated that includes the name "Interpage" as "Interpage." Mr. Vernikov avers that he is "the owner of a sole-proprietorship doing business under the name Interpage Co. ("Interpage"), a respondent in" ALB-GOLD's § 1782 application. Vernikov Decl. ¶ 2. He then goes on to claim that "Interpage's principal place of business and headquarters is located in" Florida, and that "Interpage is not incorporated under the laws of the State of New York, nor does Interpage maintain any place of business in New York."[10] Vernikov Decl. ¶¶ 4–5.

---

[9] *See* N.Y. Corporations Database, https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY (search of database of business entities for Entity Name "Interpage" and Name Type "All") (last accessed August 30, 2019).

Courts regularly take judicial notice of information contained in the N.Y. Corporations Database. *See, e.g.*, *Paysafe Partners LP v. Merch. Payment Grp. LLC*, No. 19-CV-495 (LGS), 2019 WL 1986607, at *1 n.1 (S.D.N.Y. May 6, 2019); *J & J Sports Prods. Inc. v. Inga*, No. 18-CV-2542 (PKC) (RLM), 2019 WL 1320278, at *3 (E.D.N.Y. Mar. 22, 2019) (citing *Saudi v. Marine Atl., Ltd.*, No. 02-CV-2495, 2005 WL 8156849, at *4 (E.D.N.Y. July 1, 2005)); *Gov't Employees Ins. Co. v. Park Slope Med. & Surgical Supply, Inc.*, No. 11-CV-4028 (SLT) (RER), 2013 WL 5209415, at *5 n.1 (E.D.N.Y. Sept. 13, 2013); *Circuito Cerrado Inc. v. La Camisa Negra Rest. & Bar Corp.*, No. 09-CV-5181 (RJD) (MDG), 2011 WL 1131113, at *2 (E.D.N.Y. Mar. 7, 2011), *adopted by* 2011 WL 1131130 (E.D.N.Y. Mar. 28, 2011).

[10] It is unclear what kind of entity named Interpage Mr. Vernikov has established in Florida. SunBiz, the Florida Department of State's Corporation and Business Entity Database, contains no record of an entity with that name for which Mr. Vernikov serves as an agent. *See* http://search.sunbiz.org/Inquiry/CorporationSearch/ByName (search of database of Corporations, Limited Liability Companies, Limited Partnerships, and Trademarks for "Interpage") (last accessed August 30, 2019); http://dos.sunbiz.org/genipart.html (search of database of General Partnerships and Limited Liability Partnerships for "Interpage") (last accessed August 30, 2019); http://dos.sunbiz.org/ficinam.html (search of database of Fictitious Names for "Interpage") (last accessed August 30, 2019).

It is not correct that the respondent in ALB-GOLD's application is the "Interpage" that Mr. Vernikov has established in Florida. Rather, the respondent is Interpage Co. incorporated in New York, which is the signatory to the Distribution Agreement with ALB-GOLD, the Alex's Meat Agreement, and the Alex's Meat Settlement Agreement, *and* is the claimant in the arbitration. "The fact that two or more corporations have the same shareholders or officers, or both, does not destroy their character as distinct entities; nor does similarity or identity in names make two corporations the same, particularly where they are incorporated in different states." Fletcher Cyclopedia of the Law of Corporations § 25 (2018). Mr. Vernikov's declaration is thus non-responsive to ALB-GOLD's assertions regarding the location of "Interpage." The New York Interpage and the Florida Interpage are two different companies.

It is true that Interpage Co. in New York was dissolved on October 5, 2017 and remains dissolved as of this writing. However, "New York law provides that a dissolved corporation remains liable for claims that arose against it prior to its dissolution." *Durso v. Cappy's Food Emporium, Ltd.*, No. 05-CV-3498, 2006 WL 3725546, at *2 (E.D.N.Y. Dec. 14, 2006) (citing N.Y. Bus. Corp. L. § 1006(a)(4) and (b)); *accord Lu Nan Fan v. Jenny & Richard's Inc.*, No. 17-CV-6963 (WFK) (RLM), 2019 WL 1549033, at *4 (E.D.N.Y. Feb. 22, 2019), *adopted by* 2019 WL 1547256 (E.D.N.Y. Apr. 9, 2019). Put another way, "a corporation undergoing dissolution continues to exist for the purpose of and for as long as is necessary to satisfy and provide for its debts and obligations[,] and it may sue or be sued on these obligations until its affairs are fully adjusted." *Rodgers v. Logan*, 121 A.D.2d 250, 253 (N.Y. App. Div., 1st Dep't 1986) (citing *City*

---

Like the N.Y. Corporations Database, the Court may take judicial notice of records contained in SunBiz. *See Rubinstein v. Keshet Inter Vivos Tr.*, No. 17-CV-61019, 2018 WL 3730875, at *5 n.7 (S.D. Fla. June 11, 2018), *adopted sub nom.*, *Rubenstein v. Keshet Inter Vivos Tr.*, No. 17-CV-61019, 2018 WL 3730867 (S.D. Fla. June 27, 2018) (citations omitted).

*of New York v. New York & S. Brooklyn Ferry & Steam Transp. Co.,* 231 N.Y. 18, 22 (1921) (Cardozo, J.) ("The [predecessor of the New York Business Corporation Law] . . . provides that 'for the purpose of enforcing [] debts or obligations,' the corporation may sue and be sued 'until its business and affairs are fully adjusted and wound up.'")); *accord Next Millennium Realty, L.L.C. v. Adchem Corp.*, No. 03-CV-5985 (GRB), 2016 WL 1178957, at *6 (E.D.N.Y. Mar. 23, 2016), *aff'd*, 690 F. App'x 710 (2d Cir. 2017).

The parties have not briefed the question of whether Interpage Co. in New York has wound up its affairs such that it may not be subject to a subpoena. Nonetheless, it is worth noting that the company did not file its notice of claim initiating arbitration against ALB-GOLD until *after* its dissolution. *Compare* N.Y. Corporations Database, DOS ID # 3776108 (reflecting that Interpage Co. in New York was dissolved on October 5, 2017) *with* Arbitration Award ¶ 57 (reflecting that Interpage Co. in New York filed its notice of claim against ALB-GOLD on October 18, 2017). Unless the company's dissolution were held to render the entire arbitration invalid, the mere fact of its dissolution would also not render it immune from subsequent legal action, as Interpage seems to suggest in its briefing. And since the Swiss Federal Supreme Court retains the authority to order the revision of an arbitral award rendered in Switzerland, *see* Section 2(B)(i), *infra*, the award is not completely final. Therefore, the Court cannot see why the dissolution of Interpage Co. in New York would prevent the discovery requested by ALB-GOLD in its 28 U.S.C. § 1782 application.

Again, though, the current record is not sufficiently clear for the Court to resolve this question. While Interpage's assertions regarding the location of the company elide the issue of corporate identity, they nonetheless call into question ALB-GOLD's own assertion that "Interpage Co. operates from" Brooklyn, Geercken Decl. ¶ 12, on which it bases its claim that the company "resides or is found" in this District, Memo ISO 17. Additionally, ALB-GOLD's submissions do

not address whether the Court may issue a subpoena against Interpage Co. in New York (a dissolved corporation) that complies with Federal Rule of Civil Procedure 45(c)(1)(A).

In light of the ambiguities in the record, the Court finds that jurisdictional discovery is appropriate. Jurisdictional discovery is available to prevent an individual or entity over whom jurisdiction is asserted from "defeat[ing] the jurisdiction of a federal court by withholding information on its contacts with the forum." *Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F. Supp. 2d 27, 29 (D.D.C. 2004) (citing *El–Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)). A "district court 'retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003). One procedure the district court may devise is to allow jurisdictional discovery sua sponte. *See, e.g.*, *Hatfill v. Foster*, 415 F. Supp. 2d 353, 356 (S.D.N.Y. 2006). Allowing jurisdictional discovery is appropriate when the plaintiff "has made a threshold showing that there is . . . a colorable claim of jurisdiction." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 195 (E.D.N.Y. 2014). Moreover, "[i]f a plaintiff has identified a genuine issue of jurisdictional fact, jurisdictional discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 812 (S.D.N.Y. 2005) (citing *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) (other citation omitted)).

For the reasons recounted above, the Court finds that ALB-GOLD has made a threshold showing that this Court may be able to grant ALB-GOLD's application and issue subpoenas against Mr. Vernikov and Interpage, but that genuine issues of fact remain. As such, the Court permits ALB-GOLD to obtain discovery from Mr. Vernikov and Interpage solely related to facts that would allow the Court to determine (1) whether they reside or are found in this District, and (2) whether subpoenas directing them to appear for depositions in Manhattan would be

enforceable.[11] ALB-GOLD shall have fourteen days from the date of this Order to serve its discovery requests, and Mr. Vernikov and Interpage shall have fourteen days after service of the requests to respond. If ALB-GOLD wishes to renew its 28 U.S.C. § 1782 application as to Mr. Vernikov and Interpage before this Court, it must do so within ten days of receiving their discovery responses. Interpage may then file its opposition, if any, to ALB-GOLD's renewed motion within ten days of service. No reply from ALB-GOLD will be permitted.

B. _Mr. Oterin, Alex's Meat, and Ms. Vernikov_

ALB-GOLD also seeks the issuance of subpoenas duces tecum against Mr. Oterin, Alex's Meat, and Ms. Vernikov. Memo ISO 2. These respondents have not entered their appearances in this action. However, the Court has reviewed and will address below those sections of Interpage's briefing that are relevant to ALB-GOLD's application against these non-appearing respondents.

First, the Court finds that Mr. Oterin, Alex's Meat, and Ms. Vernikov reside or are found in this District. ALB-GOLD's attorney avers that Ms. Vernikov and Mr. Oterin currently work in Brooklyn, and that Alex's Meat operates from Brooklyn. Geercken Decl. ¶¶ 9–11. Additionally, the Alex's Meat Agreement, which Mr. Oterin signed on behalf of Alex's Meat, was executed in Brooklyn. _See_ Alex's Meat Agreement, ECF No. 3-2 at 104. There is no record evidence that these respondents are not located within this District.

Second, the Court finds that the discovery ALB-GOLD seeks against the respondents is "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). This prong has itself been assessed in two separate parts by courts in this Circuit: whether the discovery is

---

[11] The Court recognizes that these particular issues may not be, strictly speaking, "jurisdictional." Nonetheless, they are at least threshold questions that are closely related to whether the Court has jurisdiction. Furthermore, limited discovery into these questions appears likely to lead to a resolution of the issues without unduly burdening the respondents. Finally, discovery into these questions is warranted in light of Interpage's evasive statements concerning Mr. Vernikov's continued contacts with New York and its non-sequitur discussion of the company in Florida known as "Interpage."

"for use" in the proceeding, and whether the proceeding qualifies as a "proceeding in a foreign or international tribunal." The "for use" language requires the court to determine whether the issuance of a dispositive ruling from the proceedings abroad is "within reasonable contemplation." *See, e.g.*, *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 248–50 (S.D.N.Y. 2018). The "proceeding in a foreign or international tribunal" language requires the court to determine whether Congress intended to allow discovery taken in the U.S. to be used for the type of legal proceedings abroad contemplated by the petitioner. *See, e.g.*, *In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d 361, 368–71 (S.D.N.Y. 2019), *appeal withdrawn*, No. 19-397, 2019 WL 2152699 (2d Cir. Mar. 19, 2019).

ALB-GOLD seeks discovery from the respondents for use in an anticipated application to the Swiss Federal Supreme Court, the highest judicial body in Switzerland, for "revision" of the Arbitration Award. Memo ISO 15. To explain the nature of this remedy, ALB-GOLD has submitted the declaration of a Swiss attorney, Dr. Xavier Favre-Bulle. *See* Favre-Bulle Decl., ECF No. 3-2 at 173–77. According to Dr. Favre-Bulle, the Swiss Federal Supreme Court has exclusive jurisdiction to order "the revision of any international arbitral award rendered in Switzerland." *Id.* ¶ 10. The court may order revision when the applicant presents new material facts which he or she was not able to submit during the arbitration proceedings. *Id.* ¶ 9. The remedy of revision is not a part of the underlying arbitration procedure; rather, it "commences a distinct, public judicial proceeding before the Swiss Federal Supreme Court." *Id.* ¶ 12. Evidence obtained through a subpoena issued pursuant to 28 U.S.C. § 1782 may be used in support of an application for revision. *Id.* ¶ 18.

i.    *A dispositive ruling on the Swiss revision application is within reasonable contemplation*

In its landmark decision in *Intel*, the U.S. Supreme Court held that § 1782(a)'s statutory requirement that the discovery sought be "for use" in a foreign proceeding implicitly requires that "a dispositive ruling by the [foreign tribunal] be within reasonable contemplation." 542 U.S. at 259. The Supreme Court expressly stated that for a ruling to be within "reasonable contemplation," the foreign proceeding does not need to be either "pending" or "imminent." *Id*. Given that a merely planned foreign proceeding may suffice under *Intel*, lower courts have described the applicant's burden with regard to the "for use" prong as *de minimis*. *See In re Veiga*, 746 F. Supp. 2d 8, 18 (D.D.C. 2010) (collecting cases); *accord In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d at 371.

Nonetheless, the Second Circuit has held:

> [T]he applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated . . . . [The] applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye.

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123–24 (2d Cir. 2015). Accordingly, courts in this Circuit have denied § 1782 applications for failure to satisfy the "for use" requirement when they have perceived that the applications are mere fishing expeditions. *See Ayyash v. Crowe Horwath LLP,* No. 17-MC-482 (AJN), 2018 WL 2976017, at *3 (S.D.N.Y. June 13, 2018); *In re MT BALTIC SOUL Produktentankschiff-Ahrtsgesellschaft mgH & Co. KG*, No. 15-MC-319 (LTS), 2015 WL 5824505, at *3 (S.D.N.Y. Oct. 6, 2015); *In re Harbour Victoria Inv. Holdings Ltd. Section 1782 Petitions*, No. 15-MC-127 (AJN), 2015 WL 4040420, at *7 (S.D.N.Y. June 29, 2015); *In re Certain Funds, Accounts, &/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Grp. LLC*, No. 14-CV-1801 (NRB), 2014 WL 3404955, at *6 (S.D.N.Y. July 9,

2014) ("[C]ourts must guard against efforts by parties to engage in fishing expeditions before actually launching litigation.").

Interpage contends that ALB-GOLD's proposed Swiss revision application is not within reasonable contemplation. It argues that "[g]ranting discovery based solely on a statement in a Swiss lawyer's declaration that [ALB-GOLD] 'anticipates' filing suit sometime in the near future . . . without the provision of any factual support for that representation does not satisfy Section 1782's 'within reasonable contemplation' requirement." Opp'n 9. Interpage also points out that ALB-GOLD has not yet retained Swiss counsel and claims that the instant application is a mere fishing expedition. *Id*. Finally, Interpage submits a competing declaration from another Swiss attorney, who avers, in sum and in substance, that although revision of an arbitral award by the Swiss Federal Supreme Court is an available remedy, it is subject to stringent requirements and is rarely granted. Declaration of Dr. Isabelle Romy ("Romy Decl.") ¶¶ 8–9, ECF No. 10. This attorney proffers that she does not believe ALB-GOLD could meet the criteria for an award of revision of the arbitral award. *Id.* ¶ 13.

The Court finds that the Swiss revision proceedings proposed by ALB-GOLD are within reasonable contemplation. Both parties' proposed legal experts agree that revision of the arbitral award is an available remedy under Swiss law if the applicant presents newly discovered material facts that it was unable to discover previously. *See* Favre-Bulle Decl. ¶ 8; Romy Decl. ¶ 8. The fact that they disagree about how likely it is that the Swiss Federal Supreme Court will grant revision in this case is unsurprising. The Court is obviously neither equipped nor required to decide this question. *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) ("[I]t is unwise—as well as in tension with the aims of [§] 1782—for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps,

biased interpretations of foreign law."). ALB-GOLD need only demonstrate a "concrete basis," *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d at 124, for its stated plan to apply for revision in Switzerland.

ALB-GOLD has set forth indicia of possible fraud by the respondents that provides the requisite concrete basis for their application. Interpage contracted to purchase 960 tons of pasta from ALB-GOLD for sale in the U.S. market, but then fell out with ALB-GOLD because of low sales. Shortly after ALB-GOLD called Interpage to say that it would no longer provide pasta for the U.S. market, Interpage entered into a contract to sell 960 tons of pasta to Alex's Meat, a U.S. distributor. Even though Interpage failed to find an adequate substitute for ALB-GOLD's pasta, it neglected to inform ALB-GOLD of Alex's Meat's supposed order for several years. This behavior may or may not be collusive, but it is not purely commercial. Especially in light of the fact that the Tribunal rested its finding that there was no collusion between Interpage and Alex's Meat on ALB-GOLD's failure to meet its evidentiary burden, Arbitration Award ¶ 241, further discovery is warranted. ALB-GOLD has presented several other facts in its application—the timing of the settlement relative to the progress of Interpage's litigation with Threeline, Interpage's apparent overcompensation of Alex's Meat in the settlement and lack of defense against the settlement—which suggest that § 1782 discovery may allow ALB-GOLD to uncover new material facts that would support an application for revision in Switzerland.[12]

Interpage's other arguments with respect to the "for use" prong fall flat. The retention of foreign counsel by a § 1782 applicant may serve as evidence that the foreign proceeding is within

---

[12] ALB-GOLD not only has a concrete basis to take discovery against Mr. Oterin and his company Alex's Meat because of their status as parties to the allegedly fraudulent agreements in these actions, but from Ms. Vernikov, as well, because Mr. Vernikov testified at the arbitration hearing that she drafted the Alex's Meat Settlement Agreement. Arbitration Award ¶ 243.

reasonable contemplation, *see, e.g.*, *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d at 249, but the fact that the applicant has not yet retained foreign counsel does not necessarily indicate the opposite. ALB-GOLD previously retained Swiss counsel to represent it in the arbitration proceedings and has submitted the declaration of a Swiss attorney with the instant application, both of which suggest that the retention of Swiss counsel will not be a significant obstacle to seeking revision. The Court also disagrees with Interpage's contention that ALB-GOLD's application is "an impermissible fishing expedition," Opp'n 9. The nature of the discovery sought by ALB-GOLD (whether the Alex's Meat Agreement or Alex's Meat Settlement Agreement were the product of fraud) and the purpose for which it seeks that discovery (a revision application to the Swiss Federal Supreme Court) are both sufficiently clear and sufficiently narrow to overcome this charge.

As such, ALB-GOLD has met its *de minimis* burden of showing that the Swiss revision proceedings are within reasonable contemplation.

      ii.     *An application for revision to the Swiss Federal Supreme Court qualifies as a proceeding in a foreign tribunal*

Interpage next contends that a Swiss revision application does not qualify as a proceeding in a foreign tribunal within the meaning of 28 U.S.C. § 1782. Opp'n 10–11. Both experts agree that if the Swiss Federal Supreme Court were to grant ALB-GOLD's application for revision, it would remand the case back to arbitration rather than enter its own award. Favre-Bull Decl. ¶ 15; Romy Decl. ¶ 10. Interpage claims that this means that the evidence sought by ALB-GOLD in the instant application is *really* for use in a foreign private arbitration, which it submits does not qualify as a proceeding in a foreign or international tribunal. Opp'n 10–12.

On the contrary, the most proximate proceeding for which ALB-GOLD seeks discovery is not a private foreign arbitration, but a revision application submitted to the Swiss Federal Supreme

Court. There can be no doubt that the Swiss Federal Supreme Court qualifies as a "tribunal" under the second prong of § 1782(a). *See Intel*, 542 U.S. at 258 ("[T]he term 'tribunal' . . . includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts[.]") (quoting Hans Smit, *International Litigation under the United States Code*, 65 Colum. L. Rev. 1015, 1026 n. 71 (1965)). Moreover, the Second Circuit has explicitly held that discovery obtained pursuant to a § 1782 application may be used in subsequent legal proceedings so long as the proceeding for which the applicant originally seeks qualifies as "a proceeding in a foreign or international tribunal." *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134–35 (2d Cir. 2017). Therefore, the possibility that the Swiss court will reopen the arbitration and ALB-GOLD will present the newly discovered material at that arbitration is no bar to its § 1782 application.[13]

Finally, ALB-GOLD is clearly an interested person under the third statutory factor because it was a party to the arbitration that it now plans to ask the Swiss Federal Supreme Court to revise. Therefore, the Court finds that ALB-GOLD has met all three statutory requirements for its application under 28 U.S.C. § 1782 as to Alex's Meat, Mr. Oterin, and Ms. Vernikov.

---

[13] Even if the Court were to find that ALB-GOLD is really seeking discovery "for use in" a reopened private arbitration as Interpage claims, the Court notes that district courts in this Circuit have disagreed on the question of whether a private foreign arbitration qualifies as a "proceeding in a foreign or international tribunal" within the meaning of § 1782(a). *Compare In re Application of Hanwei Guo for an Order to Take Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. §?1782*, No. 18-MC-561 (JMF), 2019 WL 917076, at *2 (S.D.N.Y. Feb. 25, 2019) (finding that a private foreign arbitration is not a qualifying proceeding), *with In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d at 369–70 (finding the opposite). On August 30, 2019, Interpage submitted a Notice of Supplemental Authority identifying the opinion *In re Petrobras Securities Litigation*, No. 14-CV-9662 (JSR), 2019 WL 3403281 (S.D.N.Y. July 29, 2019), in which the Court held that a private foreign arbitration is not a qualifying proceeding, at *6–7, as further supportive of its argument that ALB-GOLD's requested discovery would not be for use in a qualifying proceeding. *See* ECF No. 18.

As the Court has discussed, the question in this case is not whether a private foreign arbitration is a qualifying proceeding, but whether an application for revision to the Swiss Federal Supreme Court is. The Court readily answers that question in the affirmative. Therefore, the Court need not enter this broader, ongoing debate and does not find Interpage's purported supplemental authority to be relevant.

*Discretionary Factors*

Having found that ALB-GOLD has satisfied the statutory requirements as to these respondents, the Court must consider whether its application warrants a favorable exercise of discretion. *Intel*, 542 U.S. at 264. After evaluating the four factors announced by the Supreme Court in *Intel* and Interpage's additional assertion that ALB-GOLD unjustifiably delayed in bringing the application, the Court concludes that it does. The Court will discuss each of these factors in turn below, again considering the arguments made by Interpage where they are relevant to the Court's analysis as to the other respondents.

1. *Whether a foreign court may order the parties to produce the requested evidence*

Dr. Favre-Bulle, in his declaration submitted by ALB-GOLD, avers that the Swiss Federal Supreme Court cannot itself compel discovery from entities and individuals located in the United States. *See* Favre-Bulle Decl. ¶ 7. There is no other evidence in the record that suggests otherwise.[14] This factor thus weighs in favor of granting ALB-GOLD's application.

2. *The nature of the foreign tribunal, the character of the proceedings abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance*

For purposes of § 1782, a foreign tribunal's "receptivity" involves not whether a particular tribunal would permit discovery in its own proceeding, but how a "foreign legal system . . . might respond to § 1782 assistance from a United States court." *In re Application of OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009). Under Second Circuit precedent, the district court is to assume that the foreign tribunal would be receptive to evidence

---

[14] Interpage points out that an "Applicant's need for § 1782 help 'is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.'" *Schmitz*, 376 F.3d at 85 (quoting *Intel*, 542 U.S. at 264); *see* Opp'n 13. But this does not apply to any of the respondents against whom the Court is currently granting ALB-GOLD's application for discovery, as Interpage itself is the only respondent who would be a prospective party to ALB-GOLD's planned application for revision.

discovered through a § 1782 request absent "authoritative proof" to the contrary. *See Euromepa S.A.*, 51 F.3d at 1100. Here, there is no evidence that Switzerland or the Swiss Federal Supreme Court would reject discovery material obtained through § 1782 or would object to the discovery being taken. As such, the second factor is neutral or slightly favors ALB-GOLD. *See In re Application of OOO Promnefstroy*, 2009 WL 3335608, at *7–8.

3. *Whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States*

The third *Intel* factor serves to protect against applicants using 28 U.S.C. § 1782 as a means to circumvent restrictions on discovery imposed by foreign courts and tribunals. *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195–96 (S.D.N.Y. 2006) (rejecting a § 1782 application where similar discovery requests were either pending before, or previously denied by, the foreign court). At the same time, the fact that discovery may be unavailable through an application to the foreign tribunal does not mean that a § 1782 application is a circumvention of the tribunal's proof-gathering restrictions. *See Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015) ("That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means."). Here, according to the declaration of ALB-GOLD's Swiss attorney, "the Swiss Federal Supreme Court has held that evidence obtained in foreign-based proceedings may be used as evidence in revision proceedings in Switzerland." Favre-Bulle Decl. ¶ 18. With no record evidence that ALB-GOLD's application is "an attempt to circumvent foreign proof-gathering restrictions or other policies of" Switzerland or the United States, the third *Intel* factor is neutral or slightly favors ALB-GOLD.

4. *Whether the request is unduly intrusive or burdensome*

A "district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the

- 23 -

Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302 (citing *In re Edelman,* 295 F.3d at 179). Under the current version of the Rule, the two fundamental considerations that the Court must balance are relevance and proportionality. *See N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 47 (E.D.N.Y. 2018) (citations omitted).

Interpage argues forcefully that ALB-GOLD's § 1782 application is unduly burdensome in its entirety, contending that the application is merely an attempt by ALB-GOLD to retry claims that were rejected by the arbitration tribunal. Opp'n 14–15. To this end, Interpage notes that the tribunal "examined with great attention" the question of whether there was collusion between Interpage and Alex's Meat. *Id.* 3, 14. However, as discussed, the tribunal immediately went on to note that the burden was on ALB-GOLD to prove such collusion and that it had not discharged this burden. Arbitration Award ¶ 241. It is clear that the tribunal found that there was insufficient evidence of collusion, not that it rejected the possibility of collusion altogether.

To be sure, the Arbitration Award does reflect that ALB-GOLD has already had a substantial opportunity to question Mr. Oterin and Mr. Vernikov (although not Ms. Vernikov), and that it has received significant documentation related to the Alex's Meat Agreement and Settlement Agreement. Ultimately, though, the red flags surrounding these agreements that ALB-GOLD has set forth in its application lead the Court to conclude that ALB-GOLD's need for the requested discovery outweighs the burden on Mr. Oterin, Alex's Meat, and Ms. Vernikov to provide it. *See In re Chevron Corp.*, 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010) ("[A]ny burden on [the § 1782 respondent] must be counterbalanced against the need for the documents, which is very great indeed."), *aff'd* 409 Fed. App'x 393, 395 (2d Cir. 2010). The Court has reviewed the proposed subpoenas duces tecum submitted by ALB-GOLD against these three respondents. *See* ECF No. 3-2 at 123–130 (Ms. Vernikov), 132–139 (Mr. Oterin), 141–156. The Court concludes that the

information requested therein is relevant and proportional to ALB-GOLD's needs. The fourth *Intel* factor thus weighs in favor of granting ALB-GOLD's application as to these three respondents.

    5.  *Delay*

The Court also considers, in the exercise of its discretion, ALB-GOLD's delay in filing the instant application. While delay is not itself an *Intel* factor, "the Second Circuit has made clear that a request for assistance under section 1782 that is 'inexcusably untimely' would not provide an 'efficient means of assistance to the foreign proceedings,' which is one of the twin aims of the statute." *In re Hully Enterprises, Ltd.*, 358 F. Supp. 3d 331, 348 (S.D.N.Y. 2019) (collecting cases).

Interpage notes that ALB-GOLD filed the instant application two and a half years after the arbitration commenced and six months after the Tribunal issued the Arbitration Award. Opp'n 16. It argues that ALB-GOLD has no justification for this gap.

First, the Court does not find that ALB-GOLD delayed two and a half years in bringing this application, which would amount to a finding that it should have submitted the application at the beginning of the arbitration proceedings initiated by Interpage. As discussed, *supra*, the question of whether foreign private arbitration qualifies as a proceeding in a foreign tribunal within the meaning of § 1782 is very much unsettled in this Circuit. (Interpage itself argues that such a proceeding does not qualify under the statute.) It would not be reasonable to hold that ALB-GOLD delayed in the filing of this application by not submitting it during (or prior to) a proceeding that it may have been statutorily ineligible to obtain discovery "for use" in.

ALB-GOLD does not provide a reason why it waited roughly six months after the conclusion of the arbitration proceedings to file this application. Nonetheless, the Court cannot find that this delay renders the application "inexcusably untimely" such that it would undermine the purpose of 28 U.S.C. § 1782. Of the cases cited by Interpage in which courts denied § 1782

applications on the basis of unjustified delay, Opp'n 16, the shortest length of delay is one year, and in that case, the court rested its decision on several factors, only one of which was the applicant's delay. *See In re Caratube International Oil Co., LLP*, 730 F. Supp. 2d 101, 105–08 (D.D.C. 2010). Although ideally § 1782 applicants will explain a delay between when the need for the discovery became apparent and when they filed the application, ALB-GOLD's six month delay does not justify denial of its application, particularly in light of the significant case it has made for the necessity of the discovery it seeks.

## CONCLUSION

For the reasons discussed herein, ALB-GOLD's application as to Alex's Meat, Mr. Oterin, and Ms. Vernikov is GRANTED. Counsel for ALB-GOLD shall contact the chambers of the undersigned by telephone to arrange for the receipt of so-ordered subpoenas against these respondents. The Court DEFERS ruling on the application as to Mr. Vernikov and Interpage to allow for jurisdictional discovery as described herein.

**SO ORDERED.**

_____/s/_____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Brooklyn, New York
August 30, 2019